UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
JAMES LEE,

                Plaintiff,                        **Index No. 1:17-cv-07249**

        -v-

                                                      **AMENDED COMPLAINT**

KYLIN MANAGEMENT FIRM LLC,

                Defendant.
----------------------------------------------------------------X

        Plaintiff James Lee, by and through his attorneys Lax & Neville LLP, complaining of Defendant Kylin Management LLC ("Kylin"), sets forth this amended complaint and alleges as follows:

**PRELIMINARY STATEMENT**

        Mr. Lee, while a managing director at Kylin, was singlehandedly responsible for the majority of the fund's growth in 2015. Under Kylin's compensation plan for managing directors, Mr. Lee earned a salary, a commission based on his individual performance, and carried interest based on the fund's overall performance. Despite the considerable hard work of Mr. Lee and the substantial benefit conveyed to the fund, Kylin withheld the vast majority of Mr. Lee's 2015 commission, refused to pay Mr. Lee his carried interest, began withholding portions of Mr. Lee's salary, and, following Mr. Lee's attempt to resolve the issue, abruptly terminated him in February 2017. Kylin then refused to pay Mr. Lee the compensation he earned prior to his termination and additionally withheld the base salary Mr. Lee was entitled to receive as part of his non-competition agreement with Kylin. To date, Kylin has unlawfully withheld $3,195,092.53 of Mr. Lee's earned compensation in violation of his employment contract, New York Labor Law, and various other claims as alleged herein.

## THE PARTIES

1. Mr. James Lee has thirty years of experience in the financial services industry and, until recently, was a managing director at Kylin Management LLC. At all times relevant to this dispute, Mr. Lee was a resident of Connecticut.

2. Kylin Management LLC is a Delaware limited liability company located at 475 5th Avenue, 11th Floor, New York, NY 10017. Kylin registered with the SEC (SEC # 801-73520).

## JURISDICTION

3. Mr. Lee and Kylin executed an employment agreement on November 2, 2015, attached hereto as Exhibit A, pursuant to which they "each irrevocably consent[ed] to the exclusive jurisdiction of the federal and state courts located in New York, New York in connection with any action or proceeding arising out of, connected with or related to this letter or the employment relationship contemplated hereby." Ex. A, ¶ 10.

4. Mr. Lee is a citizen of the United States domiciled in Greenwich, Connecticut.

5. Kylin is a limited liability company organized under the laws of the State of Delaware. Upon information and belief, Kylin's members are Silver Phoenix Management LLC, Black Osprey Management LLC, YS Management LLC, and Kylin Capital Management LP.

6. Silver Phoenix Management LLC is a Delaware limited liability company. Upon information and belief, the members of Silver Phoenix Management LLC are Ted Kang, Yusuke Suzuki, and the Kang 2007 Family Trust.

7. Upon information and belief, Ted Kang is a citizen of the United States domiciled in New York, New York.

8. Upon information and belief, Yusuke Suzuki is a citizen of the United States domiciled in Long Branch, New Jersey.

9. Upon information and belief, the Kang 2007 Family Trust is a traditional trust and Yusuke Suzuki is the sole trustee.

10. Black Osprey Management LLC is a limited liability company organized under the laws of the State of Delaware. Upon information and belief, the members of Black Osprey Management LLC are Ted Kang, Yusuke Suzuki, and the Kang 2007 Family Trust.

11. YS Management LLC is a limited liability company organized under the laws of the State of Delaware. Upon information and belief, the members of Black Osprey Management LLC are Yusuke Suzuki, Michiyo Suzuki, and the Suzuki 2006 Family Trust.

12. Upon information and belief, Michiyo Suzuki is a United States citizen domiciled in Long Branch, New Jersey.

13. Upon information and belief, the Suzuki 2006 Family Trust is a traditional trust and Michiyo Suzuki is the sole trustee.

14. Upon information and belief, Kylin Capital Management LP is a limited partnership organized under the laws of the State of Delaware with two limited partners, Ted Kang and Red Falcon Management LLC, and one general partner, Kylin Capital Management GP LLC.

15. Red Falcon Management LLC is a limited liability company organized under the laws of the State of Delaware. Upon information and belief, the members of Red Falcon Management LLC are Ted Kang, Yusuke Suzuki, and the Kang 2007 Family Trust.

16. Kylin Capital Management GP LLC is a limited liability company organized under the laws of the State of Delaware. Upon information and belief, the members of Kylin Capital Management GP LLC are Ted Kang and Red Falcon Management LLC.

17. Because the plaintiff in this case is a citizen of Connecticut and the defendant in this case is a citizen of both New York and New Jersey, complete diversity of citizenship exists between the Parties.

18. Because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, this Court has jurisdiction over the dispute.

## FACTUAL BACKGROUND

19. Mr. Lee graduated from the University of California, Los Angeles, with a degree in economics in 1987 and has been working in the financial services industry ever since. Mr. Lee began working as an analyst and gained experience with firms both in the United States and abroad. In 1994, Mr. Lee took his Series 7 exam and spent the next seven years as a registered salesperson in international sales. In 2002, Mr. Lee moved to Connecticut with his wife and children, where they still reside today.

20. From 2002 until 2013, Mr. Lee worked for a variety of hedge funds, including Tiger Asia Management (now Archegos Capital Management), where he met Ted Kang. Mr. Lee and Mr. Kang became good friends and they stayed in touch after Mr. Lee left Tiger Asia. Mr. Kang founded Kylin Management in 2005 and, in 2013, he invited Mr. Lee to join his firm.

21. When Mr. Lee joined Kylin in June 2013, his decades of experience and the skills he brought with him made him a nontraditional hire. While Mr. Lee's considerable knowledge and experience qualified him for a position as a senior member of the Kylin team, Mr. Kang indicated that he wanted a period of time in which to test how Mr. Lee would fit within the firm. Mr. Kang also wanted to avoid any perception on behalf of the other employees that Mr. Lee was being permitted to advance quickly up the firm's hierarchy without first paying his dues. Mr. Lee's first employment agreement with Kylin, dated May 14, 2013 and attached hereto as Exhibit B, reflects this balancing of interests. Rather than joining immediately as a managing

director, Mr. Lee's first position with Kylin was as a consultant. As a consultant, he received a salary of $13,750 a month and undertook senior responsibilities commensurate with his skill and experience, but did not receive firm benefits or participate in the firm's commission program. The term of the agreement was July 1, 2013 through June 30, 2014. Mr. Lee and Mr. Kang agreed to reevaluate Mr. Lee's position and compensation towards the end of the contract.

22. Mr. Lee dedicated himself wholeheartedly to his work at Kylin. He worked long hours and spent time familiarizing himself with the firm and its clients. The firm primarily serves investors both in the United States and abroad who are looking to invest in companies based in Japan, Korea, and China. Most members of the firm focused exclusively on one of those three areas. Because Mr. Lee had previous experience with the securities markets of each country, including from his time working abroad, he was one of a select few at Kylin to work with potential investments from all three countries. His experience and exposure allowed him to diversify and expand Kylin's potential investments and suggest securities to which the firm would not otherwise have been exposed. As a result, Mr. Lee was incredibly successful throughout the remainder of 2013 and the first half of 2014. In June 2014, he and Mr. Kang extended his employment contract through the end of 2014. A copy of the extension is attached hereto as Exhibit C.

23. Mr. Lee continued to perform well throughout the rest of 2014. In December, 2014, Mr. Lee was offered a position as a managing director of Kylin beginning in January 2015. His salary was increased to $250,000 a year, he was to receive regular employee benefits, and, importantly, he became eligible to participate in the firm's commission program. The details of his new position were memorialized in an employment agreement, attached hereto as Exhibit D.

24. At the end of 2014, the managing directors and Mr. Lee, who was soon to be a managing director, met with Mr. Kang to discuss changing the commission compensation

structure at Kylin. At the time, Kylin distributed commission compensation through a carried interest program. Each employee who qualified for the program received a percentage of the total fees the fund generated. Managing directors routinely received 3% while junior employees received less. The commission vested in three staggered amounts over two years and the percentage distributed at each stage varied from year to year based on an individual's performance.

25. During their meeting, the managing directors voiced their dissatisfaction with the program, particularly the basing of commissions on the overall performance of the fund, rather than the individual efforts of its employees. Such a system, they argued, reduced individual incentives to perform well, because high performing employees were effectively subsidizing their lower performing peers. The managing directors proposed that commissions be distributed based on a percentage of the fees each individual generated and suggested that Kylin adopt the 30% rate used by other funds. After much discussion and brainstorming, Mr. Kang and the managing directors compromised and agreed that they would test a combination of the established carried interest program and the individual commission program for managing directors in 2015.

26. Under the 2015 system, managing directors were still entitled to receive a percentage of the fund's generated fees, vesting over a two year period. In addition, the individual managing directors were entitled to a certain percentage of the fees they generated. Mr. Kang and the managing directors agreed to reevaluate the commission structure again at the end of 2015.

27. For 2015, as a managing director, Mr. Lee was entitled to receive 3% of the fund's generated fees for that year as carried interest which was scheduled to vest as follows: 40% in December 2015, 40% in December 2016, and the remaining 20% in December 2017. He

6

was additionally entitled to receive 10% of the fees he generated. This compensation agreement was memorialized by a term sheet Mr. Lee signed on June 19, 2015, which is attached hereto as Exhibit E.

28. In November 2015, Mr. Lee was presented with an updated employment agreement. A term sheet identical to the one Mr. Lee signed in June was attached to the updated agreement, which is attached hereto as Exhibit F. Mr Lee signed both the updated employment agreement and the term sheet on November 2, 2015.

29. 2015 proved to be an exceptional year for Mr. Lee. The fund grew considerably and Mr. Lee was personally responsible for the majority of that growth. At the end of 2015, 10% of the fees Mr. Lee generated amounted to $3,045,600 and his carried interest was $1,253,000.

30. At the end of each year, members of the firm frequently elected to invest their carried interest commissions into the Kylin fund as those commissions vested. Consistent with this practice, Mr. Lee chose to invest the 40% of his carried interest that vested at the end of 2015, which amounted to $501,200. The commission was directly invested in the fund as a general partnership interest as soon as it vested in December 2015.

31. At Mr. Lee's 2015 performance review in January 2016, Mr. Kang confirmed that Mr. Lee's 10% commission was $3,045,600 and his carried interest was $1,253,000, but informed Mr. Lee that Kylin would have to defer the payment of Mr. Lee's individual commission and distribute it in a similar manner to the timeline used for Kylin's carried interest. Mr. Kang explained that the total amount was too large for Kylin to pay out all at once. Mr. Lee protested that they had never agreed to any deferral of his 10% commission, but Mr. Kang remained adamant that the deferral was necessary. Mr. Kang told Mr. Lee not to worry, promising him that the commission would be kept in a separate account until it was paid out, and

assured him that he would receive the entirety of his earned commission. Mr. Lee was the only managing director who his 10% commission deferred in any way.

32.     In February 2016, after several delays which Mr. Kang attributed to the payroll company Kylin used, Mr. Lee received $1,218,240 of the $3,045,600 he had earned as an individual commission.

33.     The firm did not perform as well in 2016 as it did in 2015. In the middle of June 2016, Mr. Kang informed Mr. Lee that he would not be receiving the remainder of his 2015 carried interest commission and would not receive any carried interest for his work in 2016. Mr. Kang informed Mr. Lee that if he did not sign a memorandum of understanding memorializing the forfeiture of his 2015 carried interest, he would be demoted back to his consultant position.

34.     Around this time, Mr. Kang began ostracizing Mr. Lee. Mr. Kang changed meeting times for the managing directors without updating Mr. Lee, excluded him from planning discussions, and ridiculed Mr. Lee's work. Mr. Kang's treatment of Mr. Lee worsened progressively over the remainder of 2016. In the early fall, Mr. Kang threatened not to pay Mr. Lee the remaining 60% of his individual commission at all. Kylin then failed to pay the next 40% of Mr. Lee's individual commission in December 2016. In January 2017, Mr. Kang began threatening to move Mr. Lee to a cubicle where the analysts and associates sat. In mid-January 2017, Mr. Kang stopped paying Mr. Lee his contractually agreed upon full salary. As several important employees and members began to quit Kylin because of problems at the firm, Mr. Kang unjustifiably blamed Mr. Lee for the departures.

35.     Mr. Lee felt that he was being slowly forced out of the company. On February 23, 2017, Mr. Lee attempted to discuss an amicable end to his employment that would include the payment of his wrongfully withheld compensation with Mr. Kang. When he broached the subject, Mr. Kang declared that the next workday would be Mr. Lee's last. Before Mr. Lee

8

arrived at the office on February 24, 2017, he received an email from Mr. Kang instructing him not to come in at all.

36. Over the course of the next three weeks, Mr. Lee and Mr. Kang attempted to negotiate possible terms for Mr. Lee's return to Kylin. These discussions came to a halt on March 19, 2017, when Mr. Kang emailed Mr. Lee to say that he would not be able to return and further characterized Mr. Lee's departure as a "resignation."

37. Despite claiming Mr. Lee resigned in the email correspondence between them, Mr. Kang then informed the remaining Kylin employees that Mr. Lee had been fired due to his poor performance.

38. As a terminated managing director, Mr. Lee was entitled to receive his base salary for one year while subject to the non-competition clause contained in his employment agreement. Exhibit E, ¶ 3(a-b). Rather than pay him his base salary of $250,000 until February 23, 2018 as required by the agreement, Mr. Kang paid Mr. Lee a reduced amount and stopped paying him all together in May 2017.

39. On May 23, 2017, Mr. Lee was informed that his partnership interest in the fund had been involuntarily redeemed. Mr. Lee then attempted to withdraw the carried interest which had been invested in the fund at the end of 2015. Despite his repeated attempts to contact Kylin during June and July 2017, Kylin has refused to pay Mr. Lee his money or even confirm the current amount of his investment.

40. To date, Kylin has wrongfully withheld

- $751,800 of Mr. Lee's carried interest for 2015,
- $1,827,360 of Mr. Lee's commission on the fees he generated in 2015,
- $7,692.30 of Mr. Lee's salary from his paychecks in January and February 2017,
- $23,706.90 from the base salary payments made for February through May 2017,

- $83,333.33 in base salary payments which were not made at all between May 2017 and the date of this amended complaint, and
- the current value of the 40% of Mr. Lee's 2015 carried interest, which totaled $501,200 when it was invested in the fund in December 2015.

41. Kylin has repeatedly refused to remit Mr. Lee's wages and has ceased making the base salary payments required by Mr. Lee's employment agreement. Mr. Lee's attempts to resolve the matter have been ignored.

## COUNT I
## Violation of New York Labor Law

42. Mr. Lee repeats and re-alleges each allegation of the preceding paragraphs as if fully set forth herein.

43. Mr. Lee was, undisputedly, an "employee" within the meaning of N.Y. Labor Law §§ 190(2) and a commission salesperson for the purposes of Article 6 of the NYLL..

44. Pursuant to NYLL § 191(1)(c), "a commission salesperson shall be paid . . . commissions and all other monies earned or payable in accordance with the agreed terms of employment." Pursuant to the 2015 Term Sheet, Mr. Lee was entitled to commissions comprising 3% of the fund's generated fees as carried interest and 10% of the fees he generated. Mr. Lee's individual commission was $3,045,600 and his carried interest was $1,253,000 but, to date, Kylin had retained all but $1,218,240 of Mr. Lee's individual commission. These commissions constitute "wages" under Article 6 of the N.Y. Labor Law, because "[the] compensation scheme is predicated upon an employee's personal productivity and the objective success of the venture." *Fiorenti v. Central Emergency Physicians, P.L.L.C.*, 187 Misc.2d 805, 808, 723 N.Y.S.2d 851, 855 (N.Y. Sup. Ct. Nassau County 2001). Kylin's refusal to pay Mr. Lee his commissions in accordance with its own term sheet violates NYLL § 191(1)(c).

45. N.Y. Labor Law § 193 states, with exceptions not here pertinent, that "No employer shall make any deduction from the wages of an employee . . . ." N.Y. Labor Law § 193(1). Kylin's deductions from Mr. Lee's wages additionally violates NYLL § 193(1).

46. Further, pursuant to NYLL § 191(c), "[i]f employment is terminated, the employer shall pay the wages not later than the regular pay period during which the termination occurred…" As of the date of this filing, Kylin has clearly and unequivocally terminated Mr. Lee and withheld the vast majority of Mr. Lee's earned commissions.

47. Pursuant to NYLL § 198-1(a), Mr. Lee is entitled to "the full amount of any underpayment, all reasonable attorney's fees, prejudgment interest as required under the civil practice law and rules, and, unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to one hundred percent of the total amount of the wages found to be due."

## COUNT II
## Breach of Contract

48. Mr. Lee repeats and re-alleges each allegation of the preceding paragraphs as if fully set forth herein.

49. "To establish a breach of contract claim in New York, a plaintiff must show: (1) the existence of an agreement, (2) adequate performance of the contract by plaintiff, (3) breach of contract by the defendant, and (4) damages." *XDTR, LLC v. City of Long Beach, New York,* 2016 WL 5678662 at *4 (E.D.N.Y. 2016) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

50. Mr. Lee and Kylin entered into an employment agreement pursuant to which Mr. Lee was entitled to commissions. Pursuant to the 2015 term sheet, Mr. Lee was entitled to a 3% commission on the fees generated by the fund in 2015 as well as 10% of the fees he generated.

11

Kylin's refusal to pay Mr. Lee his commissions is a material breach of Mr. Lee's employment agreement.

51. In addition to his commissions, Mr. Lee was entitled to a base salary of $250,000 during the term of his employment and for the year following his termination or resignation, while subject to the employment agreement's non-competition provisions. Kylin's refusal to pay Mr. Lee his salary both during the term of his employment and in the months that have followed his termination is a material breach of the employment agreement.

52. As a result of these repeated material breaches, Kylin is liable to Mr. Lee for an as-yet to be determined amount in excess of $3,195,092.53.

## COUNT III
## Breach of the Implied Covenant of Good Faith and Fair Dealing

53. Mr. Lee repeats and re-alleges each allegation of the preceding paragraphs as if fully set forth herein.

54. In every contract there exists an implied covenant of "good faith and fair dealing in the course of performance." *511 West 232nd Owners Corp. v. Jennifer Realty*, 98 N.Y.2d 144, 153 (N.Y. 2002). Breach of the covenant is breach of the agreement itself, the covenant being "part and parcel" of the agreement or contract. *Boscorale Operating, LLC. v. Nautica Apparel, Inc.*, 749 N.Y.S.2d 233, 234 (1st Dept 2002). The covenant is breached when a party acts in a manner that deprives the other party of the right to receive benefits under the agreement. *511 West 232nd Owners Corp.*, 98 N.Y.2d at 153. The covenant encompass[es] "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id*. (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978)).

55. By its express refusal to pay Mr. Lee his earned commissions, Kylin breached the implied covenant of good faith and fair dealing and is liable to Mr. Lee for an as-yet to be

determined amount in excess of $3,195,092.53.

## COUNT IV
### Unjust Enrichment

56.   Mr. Lee repeats and re-alleges each allegation of the preceding paragraphs as if fully set forth herein.

57.   In the alternative, Mr. Lee is entitled to relief under the theory of unjust enrichment.

58.   "[U]nder New York law, a plaintiff may prevail on a claim for unjust enrichment by demonstrating '(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'"  *Makhoul v. Watt, Tieder, Hoffar & Fitzgerald, L.L.P.,* 2016 WL 5845933, at *2 (2d Cir. 2016) (quoting *Beth Israel Med. Ctr. V. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 586 (2d Cir. 2006)).

59.   Here, Kylin greatly benefitted from Mr. Lee's tireless efforts on behalf of the firm.  Kylin has been enriched by wrongfully retaining Mr. Lee's commissions and salary, and is liable to Mr. Lee for an as-yet to be determined amount in excess of $3,195,092.53.

## COUNT V
### Quantum Meruit

60.   Mr. Lee repeats and re-alleges each allegation of the preceding paragraphs as if fully set forth herein.

61.   Mr. Lee provided services to Kylin in good faith.  Those services were beneficial to and accepted by Kylin and Kylin now has expressly refused to pay for such services.

62.   Kylin is liable to Mr. Lee in quantum meruit for an as-yet to be determined amount in excess of $3,195,092.53.

## **RELIEF**

Based on the foregoing, Mr. Lee respectfully requests judgment against Kylin providing for:

    a.    Monetary damages equal to his unpaid earned commissions in an amount to be proven at the hearing but not less than $3,195,092.53;

    b.    Attorneys' fees and costs as required by NYLL § 198(1-a);

    c.    Liquidated damages in an amount equal to his unpaid earned commissions and salary as required by NYLL § 198(1-a);

    d.    Prejudgment interest in the amount of 9 per cent per annum as required by NYLL § 198(1-a);

    e.    Interest to run as required by NYLL § 198(1-a);

    f.    For such other relief as this Court deems just, equitable and proper.

Dated:    New York, New York     **LAX & NEVILLE LLP**
            October 9, 2017     By:    ***/s/ Barry R. Lax***
                                                             Barry R. Lax, Esq.
                                                              Mary Grace White, Esq.
                                                              1450 Broadway, 35th Floor
                                                              New York, NY 10018
                                                               Tel: (212) 696-1999
                                                              *Attorneys for Claimant*